RECEIVED

JUN 2 4 2013

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                DEPUTY CLERK

FILED

JUN 2 4 2013

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

NO: **A13CV0528LY**

Citizens Against The Bar
P.O. Box 195226
Dallas, TX 75219,

                                    Plaintiff

v.

JURY TRIAL DEMAND

State of Texas
P.O. Box 12548
Austin, TX 78711-2548,

Texas Board of Law Examiners
P.O. Box 13486
Austin, TX 78711-3486,

Travis County
P.O. Box 1748
Austin, TX 78767,

Supreme Court of Texas
201 W. 14th, Room 104
Austin, TX 78701,

Julia E. Vaughan
P.O. Box 13486
Austin, TX 78711,

Buck Files
P.O. Box 12487
Austin, TX 78711

                                    Defendants.

## COMPLAINT

Comes NOW Plaintiff Citizens Against The Bar, alleging the following:

## NATURE OF THE ACTION

This lawsuit challenges the constitutionality and legality of the State Bar's monopoly over the practice of law, the State's license requirement to practice law, the State Bar Exam requirement as well as the State's requirement that individuals associate with the State Bar as a condition precedent to practicing law.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

2.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 (b)(1) because at least one Defendant resides in Travis County, Texas.

## PARTIES

3.     Plaintiff Jamar Osborne is a United States citizen and resident of Texas. Jamar Osborne is the executive director of Citizens Against The Bar. Jamar Osborne is an African-American, unlicensed law graduate.

4.     Plaintiff Mikal Osborne is a United States citizen and resident of Texas. Mikal Osborne is Plaintiff Jamar Osborne's brother and a director of Citizens Against The Bar.

5.     Defendant State of Texas is a governmental entity conducting business both in the United States of America and the State of Texas. Defendant State of Texas may be served at P.O. Box 12548, Austin, TX 78711-2548.

6.     Defendant Travis County is a governmental entity and a political subdivision of the State of Texas. Travis County is an employer within the meaning of Title VII of the Civil Rights Act, employing 500 or more employees. Defendant Travis County's principle place of business is 314 West 11th St., Room 300, Austin, TX 78701. Defendant Travis County may be served at P.O. Box 1748, Austin, TX 78767.

7.     Defendant Board of Law Examiners is a governmental agency conducting business both in the United States of America and the State of Texas. Defendant Board of Law Examiners may be served at Texas Board of Law Examiners, P.O. Box 13486, Austin, TX 78711-3486.

8.     Defendant Supreme Court of Texas is a governmental entity conducting business both in the United State of America and the State of Texas. Defendant Supreme Court of Texas may be served at: 201 W. 14th, Room 104, Austin, TX 78701.

9.      Defendant Julia E. Vaughan is resident of Travis County, Texas and the executive director of the Texas Board of Law Examiners.  She is being sued both in her individual capacity as well as in her official capacity.  Defendant Julia E. Vaughan may be served at: P.O. Box 13486, Austin, TX 78711.

10.     Defendant Buck Files is a resident of Travis County, TX and the president of the Texas Bar Association.  He is being sued both in his individual capacity as well as in his official capacity.  Defendant Buck Files may be served at: P.O. Box 12487, Austin, TX 78711.

## FACTS

11.     Plaintiff Jamar Osborne graduated from the University of Oklahoma law school.  Mr. Osborne applied for admission into the Texas Bar in 2009. However, his application was denied due to the fact that he received a combined score of 595. The minimum passing score is 675.

12.     Jamar Osborne registered to take the Texas Bar Exam in February 2013.  However, he later learned that the dates of the exam conflict with an employment opportunity.  Since he really needed the money, he decided not to take the exam.  On January 3, 2013 Mr. Osborne contacted the Board of Law Examiners informing them that he would be unable to take the exam due to a work conflict.  Mr. Osborne requested that he either receive a refund or that the money be used for the exam in July 2013.

13.     Defendant Julia E. Vaughan sent Mr. Osborne a letter stating that she would neither refund the money, nor would she apply the money toward taking a future exam.

14.     On January 13, 2013, Plaintiff Jamar Osborne applied for an Attorney I position with
        Travis County.  However, Jamar Osborne was denied employment due to the fact that
        one of the job requirements was that the applicant be licensed to practice law in the State
        of Texas. Except for the license requirement, Jamar Osborne was otherwise qualified for
        the position.

15.     In 2012, Plaintiff Mikal Osborne sought custody of his daughter.  As Mikal Osborne is
        not trained in the law, he was in need of legal counsel.  Mikal Osborne discussed
        whether his brother Jamar Osborne would be able to assist him.  Jamar Osborne
        informed Mikal Osborne that the State of Texas has made it a criminal act to practice
        law without a license. Therefore, Jamar Osborne would not be able to assist him.
        However, if this restriction did not exist, Plaintiff Jamar Osborne would have been
        willing to assist his brother for free.

16.     Plaintiff Mikal Osborne ended up hiring an attorney that he selected out of a phonebook.
        Mikal Osborne had no personal relationship and had never met this attorney.  Although
        Mikal's attorney was adequate for his purposes, Mikal Osborne still would have
        preferred being represented by his brother.  Additionally, Mikal Osborne feels that he
        was overcharged by his attorney.  Mikal Osborne was aware that he was being
        overcharged during the time of his representation, but did not dispute the charges
        because he did not want to risk losing custody of his daughter.

17.     Plaintiff Mikal Osborne ended up with thousands of dollars in legal fees.  But for the
        fact that State law denied him the right to be represented by his counsel of choice, Mikal
        Osborne would not have been overcharged.

## COUNT I – DUE PROCESS VIOLATION

18.     The allegations in paragraphs 1 through 17 of the Complaint are all realleged and incorporated by reference. All other Counts in this Complaint are also incorporated by reference.

19.     The State has deprived Plaintiff Mikal Osborne of due process by denying him the right to be represented by his counsel of choice.

20.     The Sixth Amendment guarantees the right to counsel in criminal cases. Included in the right to counsel is the right to counsel of choice. *U.S. v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006).  Where a criminal defendant has been deprived of his right to counsel of choice, it is automatic reversible error without any additional showing of prejudice. *Id.*

21.     In *Wheat v. United States,* The Court incorrectly defined the word *counsel* as members of the bar.  The Court held that under the Sixth Amendment's right to counsel of a choice, a criminal defendant is choice is limited to members of the bar.  *Wheat v. United States,* 100 L. Ed. 2d 140, *149 (1988).* The court held that a person who is not a member may not represent anyone other than himself. *Id.*

22.     Federal and State Courts have consistently held that the Sixth Amendment's right to counsel means the right to be represented by a member of the bar.  This viewpoint is untenable; it defies all sense of logic and credulity.

23.    The Bill of Rights was ratified in 1791.  However, the first State Bar unified by
legislative action did not exist until 1921. I'm no mathematician but the numbers just
don't add up. How can the Sixth Amendment's right to counsel be defined as the right to
be represented by a "member of the bar" when organized bar associations didn't even
exist at the time that the Sixth Amendment was written?  Abraham Lincoln was able to
become a lawyer without any formal education and only a 10 minute oral exam; he
certainly was not required to become a member of the State Bar. For a person to claim
that the word "counsel" means "member of the bar" says that the person is either a liar
or ignorant beyond belief.

24.    The Constitution must be interpreted to express the intent of the framers. *Woodson v.
Murdock,* 89 U.S. 351, 369 (1874).  Nowhere in the constitution did the framers express
any intent to limit citizens' right to counsel of choice to members of the bar.

25.    The Bill of Rights was adopted as an enumeration of a common law rights to protect the
people against invasion by the federal government.  *Bell v. Hood,* 71 F. Supp., 813, 816
(C.D. Cal. 1947).  Reference to the Common Law is mandatory in a proper
interpretation of the Constitution, but most particularly in the Bill of Rights.  To have a
"friend" act as Counsel was a Common Law Right and was recognized as such in the
Bill of Rights when the term "counsel" was used instead of the term "attorney".

26.     The right to be represented by a "friend" rather than an "attorney" was so fundamental
        that states enumerated this right in their constitutions:

> "And in all courts persons of all perswasions [sic] may freely appear in their
> own way, and according to their own manner, and there personally plead their
> own causes themselves, or if unable, by their friends [emphasis
> added]…"   Fundamental Constitution for the Province of East Jersey, art.
> XIX (1683).

27.     "The framers of the constitutions strove to create an independent judiciary but insisted
        upon further protection against arbitrary action.  Providing an accused with the right to
        be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or
        overzealous prosecutor and against the compliant, biased, or eccentric judge. If the
        defendant preferred the common-sense judgment of a jury to the more tutored but
        perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the
        jury trial provisions in the Federal and State Constitutions reflect a fundamental decision
        about the exercise of official power -- a reluctance to entrust plenary powers over the life
        and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power,
        so typical of our State and Federal Governments in other respects, found expression in
        the criminal law in this insistence upon community participation in the determination of
        guilt or innocence." *Duncan v. Louisiana,* 391 U.S. 145, 156 (1968).

28.     The same arguments in favor of trial by jury applies to the right to represented by a nonmember of the bar. Many citizens are distrustful of the organized bar and would prefer the common-sense advocacy of a carpenter or a farmer over the sophisticated maneuverings of a trained lawyer. Moreover, a jury might relate more to a layperson than they would to an attorney. Depriving citizens of their counsel of choice not only violates their right to an impartial jury, but it also violates their rights to Freedom of Association and Freedom of Speech (the right to choose who will speak on an individual's behalf).

29.     Trials by jury have potential for misuse but are safeguarded by the fact that prospective jurors are subject to *voir dire*, peremptory challenge and challenge for cause. *Singer v. U.S.,* 13 L. Ed. 2d 630, 638 (1965). The same could be done where a party choses to be represented a nonmember of the bar. The court in its discretion could simply make case-by-case inquiries as to whether or not representation by a layperson would result threaten the orderly conduct of the trial. This in-fact was done in *Stockheimer.*

30.     *Stockheimer* involved a case in which a criminal defendant expressed massive distrust for the organized bar and a preference for representation by someone who wasn't a member of the bar. *U.S.A. v. Stockheimer,* 385 F. Supp. 979, 984 (1974). The court declared that a criminal defendant is not relegated to either being represented by a member of the bar or representing himself; the court grant a third option: he could be represented by a layperson. *Id. at 983.* The court even went so far as to intimate that the license to represent someone comes from the client and not the government. *Id.* at 985.

31.     The court in *Stockheimer* held that the Sixth Amendment does not forbid a criminal
defendant from choosing a layperson to represent him in a court of law.  The court held
that a criminal defendant is free to be represented by a farmer or a carpenter, so long as
the layperson does not threaten the orderly conduct of the trial.  *Id.* at 984.

32.     The court overruled the State Supreme Court, holding that although the state judiciary
declared the defendant's counsel of choice unfit to practice law, the defendant's choice
should be upheld.  *Id.*  The court took into consideration the fact that this layperson was
the counsel the defendant trusted most to provide his defense.  *Id.* at 985.  The court also
considered the fact that the defendant was aware of the risk he was taking by not being
represented by a member of the bar and had made a voluntary waiver.  *Id.* at 984.

33.     In civil cases, parties have a constitutional to be heard by counsel under the due process
clauses of the Fifth and Fourteenth Amendments.  *Powell v. Alabama,* 77 L. Ed. 158,
170-171 (1932).  Given that laymen have no training in the law, to deny them the right
to be heard by counsel would in effect deny them of the right to a hearing.  *Id.*

34.     The only discernible difference between the right to counsel in criminal cases and the
right to counsel in civil cases is that in criminal cases, the parties are entitled to counsel
appointed at the government's expense whereas in civil cases, parties are entitled to
retained counsel at their own expense.  However, in both civil and criminal cases, parties
are entitled to counsel of choice.

35.    Similar to criminal cases, a deprivation of one's right to counsel of choice in a civil case is automatic reversible error without any additional showing of prejudice. *Richardson-Merrell Inc. v. Keller,* 472 U.S. 424, 438 (1985). Where a party to a civil suit is denied his right to counsel of choice, prejudice is presumed. *Flanagan v. U.S.,* 465 U.S. 259, 268 (1984).

36.    A district judge may in his discretion allow someone who hasn't passed the bar exam and isn't a member of the bar to try a case where the person is able to demonstrate sufficient learning in the law and is able to adequately represent his client in court. *U.S.A. v. Whitesel,* 543 F. 2d 1176, 1180 (6th Cir. 1976).

37.    However, the State of Texas criminalizes the practice of law by unlicensed individuals, denying State Courts discretion to determine whether an unlicensed individual is competent to represent another individual. In doing so, has deprived Plaintiff Mikal Osborne of due process; no showing of prejudice is necessary.

## COUNT II – FREEDOM OF ASSOCIATION VIOLATION

38.    The allegations in paragraphs 1 through 17 of the Complaint are all realleged and incorporated by reference. All other Counts in this Complaint are also incorporated by reference.

39.    The State's licensing requirement to practice law is overbroad and infringes on Plaintiff Mikal Osborne's constitutional rights.

40.    The State of Texas violated Plaintiff Mikal Osborne's right to freedom of association by compelling him to associate with a member of the bar (who is a complete stranger) and denying Plaintiff the right to associate with his brother, Jamar Osborne who is trained in the law but is not a member of the bar.

41.     A State violates the First Amendment's right of association when it deprives a person of the right to choose with whom he associates. *Rotary International v. Rotary Club of Duarte,* 95 L. Ed. 2d 474, 486 (1987).   The First Amendment protects familiar relationships which presuppose "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Id. at 484.*

42.     State action which curtails freedom of association is subject to strict scrutiny. *NAACP v. Alabama*, 78 S. Ct. 1163, 1171 (1958).   Even where the government's regulatory purpose is legitimate and substantial, it will not survive a First Amendment challenge where its means are not narrowly tailored. *Louisiana v. NAACP*, 81 S. Ct. 1333, 1335 (1961).

## COUNT III– ANTITRUST VIOLATIONS

43.     The allegations in paragraphs 1 through 17 of the Complaint are all realleged and incorporated by reference. All other Counts in this Complaint are also incorporated by reference.

44.     The State of Texas violates the Federal Sherman Antitrust Act by granting and continuing to allow the State Bar to monopolize the practice of law.  15 U.S.C.S. § 1 makes unlawful every contract, combination or conspiracy, in restraint of trade or commerce among the several states. 15 U.S.C.S. § 2, makes it unlawful to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states.

45.     The Texas Constitution also prohibits monopolies. It makes no exceptions even for
        public monopolies:

                PERPETUITIES AND MONOPOLIES; PRIMOGENITURE OR

                ENTAILMENTS.  Perpetuities and monopolies are contrary to the genius of a

                free government, and shall never be allowed, nor shall the law of

                primogeniture or entailments ever be in force in this State.

                Tex. Const. Art. I § 26.

46.     A monopoly is defined as "privilege or peculiar advantage vested in one or more persons
        or companies, consisting in the exclusive right (or power) to carry on a particular
        business or trade, manufacture a particular article, or control the sale of the whole supply
        of a particular commodity." *Black's Law Dictionary* 1007(Centennial ed., 6th ed., West
        1990).

47.     The Texas Bar Association has a complete monopoly in the state of Texas. Its members
        monopolize nearly 100 percent of the legal services sold in the State of Texas.

48.     The whole purpose of the Sherman Antitrust Act was to ensure competition and prevent
        corporate monopolies.  Specifically the Sherman Antitrust sought to prevent an artificial
        enhancement of prices in the market.  As is the case with all monopolies, the purpose is
        price-fixing.

49.     The public has consistently viewed lawyers as the gatekeepers for access to the law and

        the courts.   However, with legal fees being so unreasonable, 65% of all domestic cases

        are handled without any legal assistance.  In a free market, licensed attorneys should

        have to compete against the services of laymen.  Without the State Bar's credentialism,

        the price of legal services would decline drastically, making affordable legal services

        available for the poor and middle class.  Competent legal counsel would be available for

        $25 per hour.

50.     States do not have authority to grant governmental agencies immunity under the

        Sherman Act by authorizing them to violate it.  *Parker v. Brown,* 317 U.S. 341, 351

        (1943).  The U.S. Supreme Court held that state bar associations are not exempt from

        federal antitrust laws. *Goldfarb V. Virginia State Bar,* 421 U.S. 773, 791 (1975).   The

        fact that state bar associations are state agencies for some limited purposes is not a

        tenable excuse.  *Id.*  Courts have established a heavy presumption against such

        exemptions and have specifically included the sale of services as being included under

        the Sherman Antitrust Act.  *Id.*  The Court in *Goldfarb* declared that irrespective of state

        regulation, lawyers should not be able to adopt anticompetitive practice with impunity.

        *Id.*

51.     The Texas Bar Association is not entitled to the government monopoly exemption to the
        Sherman Act. That exemption applies to the sale of public utilities in which prices are
        closely regulated. The sale of legal services is not a public utility and the price of legal
        services has not been closely regulated.  The State Bar is a governmental actor in its
        limited capacity of performing administrative functions for the Texas Supreme Court.
        However, members of the bar are not governmental actors. The State has no authority to
        grant a monopoly to private individuals.

52.     The fact that the law is complicated is not compelling. If the law is law is too
        complicated, it's because lawyers and judges have made it complicated.  Transparency is
        essential in a democratic society.  Laws should be written in plain English instead of
        Latin terms and complicated legalese.  If the laws are so complicated that a person with
        three years of rigorous legal training doesn't under them, how is the average layperson
        supposed to understand them?  Members of the bar should not be rewarded with a
        monopoly for a condition which they created themselves.  Society at large may be able
        to tolerate some hypocrisy, however even tolerance has its limits. The State of Texas has
        no more authority to require the bar exam as a condition to practice law than it does to
        require literacy tests as a condition for the right to vote.

## COUNT IV– INVERSE CONDEMNATION

53.     The allegations in paragraphs 1 through 17 of the Complaint are all realleged and
        incorporated by reference. All other Counts in this Complaint are also incorporated by
        reference.

54.     Due to the State's regulation of the practice of law, Plaintiff Mikal Osborne was denied the right to be represented by the counsel of his choice. The State of Texas has regulated the practice of law to such a degree that its regulation amounts to a regulatory taking.

55.     By taking away citizens' right to be represented by the counsel of their choice and only allowing individuals to be represented by members of the bar, citizens who untrained in the law and are in need of legal services become relegated to being price-gouged.

56.     By granting members of the bar a complete monopoly over the sale of legal services in the State of the Texas, the State has deprived citizens of property without compensation.

57.     Under the Takings Clause, a claim for compensation for condemned property is actionable not only where property has been taken for a public use, but also where property has been taken for a public purpose. *Kelo v. New London,* 125 S. Ct. 2655, 2662 (2005).  In the instant case, the State does not permit nonmembers of the bar to practice law in order to "ensure the integrity of the legal profession."  This State's justification is ostensibly a public purpose.

58.     The Taking Clause "operates as a conditional limitation, permitting the government to do what is wants so long as it pays the charge. *Eastern Enterprises v. Apfel,* 524 U.S. 498, 545 (1998). The State cannot allow members of the bar to maintain a monopoly over legal services at the consumer's expense. It is the State's prerogative to determine who practices law in its courts (even though it's really supposed to be the people's courts). However, if the State of Texas wishes to compel individuals to be represented by members of the bar, most of whom are too expensive for the average citizen to afford, the State must foot the bill.

## COUNT V – PROFESSIONAL MALPRACTICE

59.     The allegations in paragraphs 1 through 17 of the Complaint are all realleged and incorporated by reference. All other Counts in this Complaint are also incorporated by reference.

60.     Defendant Buck Files breached his legal duty to enforce/ enact meaningful regulations regarding attorney's fees charged by members of the State Bar and by failing to ensure reasonable access to legal services.  But for Defendant's negligence, Plaintiff Mikal Osborne would not have been price gouged by his attorney.

## COUNT VI– TITLE VII OF THE CIVIL RIGHTS ACT VIOLATIONS

61.     The allegations in paragraphs 1 through 17 of the Complaint are all realleged and incorporated by reference. All other Counts in this Complaint are also incorporated by reference.

62.     Defendant Travis County is an employer for the purposes of Title VII of the Civil Rights Act.  Travis County has posted several attorney employment positions in which a state license to practice law is required.

63.     Plaintiff Jamar Osborne applied for an Attorney I position.  One of the requirements for the position is a license to practice law; the license to practice law requires passing the Texas Bar Exam.

64.    The bar exam has a disparate impact on African-Americans.  According to a study by the Texas Board of Law Examiners, 53 percent of African-American law graduates passed the Texas Bar Exam on the first try compared to 85 percent of white graduates.

65.    Title VII of the Civil Rights Act of 1964 prohibits both purposeful discrimination as well as race-neutral policies that disproportionately exclude minorities and that are not job related.

66.    According to most testing professionals, different outcomes for identifiable subgroups should trigger heightened scrutiny.  American Educational Research Association, American Psychological Association and the National Council on Measurement in Education, *Standards for Educational and Psychological Testing 75* (American Educational Research Association 1999).

67.    The term *bias* comes into play when there is a deficiency in the test itself which results in different scores for different identifiable subgroups. *Id.* at 74.  Although fairness does not require equal rates based on race, ethnicity, gender or disability, "examinees of equal standing with respect to the construct the test is intended to measure should on average earn the same test score, irrespective of group membership." *Id.*  A test that is designed fairly should give examinees an equal chance of performing well regardless of group membership. *Id.* at 75.

68.    Occupational tests are limited in their ability to make accurate predictions of subsequent job behaviors or job outcomes. *Id.* at 155.  Absolute fairness in standardized testing is impossible; however, the fairness of a particular exam must be judge according to feasible alternatives. *Id.* at 73.

69.     The purpose of *Standards* is to provide criteria for the evaluation of tests, testing practices and the effects of test use. *Id.* at 2.  When it comes to testing in professional and occupational credentialing, a test's validity depends on whether or not the test adequately represents the content domain being considered. *Id.* at 157. Verifying the appropriateness of cutoff scores is a critical element in validity.  To be valid, cutoff scores must be precise; arbitrary numerical classifications may put the test's validity into question. *Id.*

70.     Under Title VII's standards for job relatedness, tests must be "shown, by professional acceptable methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 431 (1975).  A test is job-related if it measures traits that are significantly related to the applicant's ability to perform the job. *Griggs v. Duke Power Co.,* 401 U.S. 424, 436 (1971).

71.      "In order to show the business necessity of a discriminatory cutoff score an employer must demonstrate that its cutoff measures the minimum qualifications necessary for successful performance of the job in question." *Lanning v. Southeastern Pennsylvania Transportation Authority,* 181 F.3d 478, 489 (3rd Cir. 1999).

72.    The Texas Bar Exam fails to be meet the testing industry's standard of content and criterion reliability.  The traits tested on the Texas Bar Exam are not significantly related to an applicant's ability to perform the job.  In the real world, no attorney is required to cite the law precisely without the benefit of consulting written notes. There is no courtroom in America that has ever required an attorney to answer 200 multiple-choice questions and six essay questions under timed conditions.   The legal standard is *minimum competency*; not competitive essays questions and certainly not 200 multiple choice questions that are designed to trick the test-taker.

73.    The Board of Law Examiners requires a minimum score of 675 in order to pass the Texas Bar Exam. This number is completely arbitrary and has no relationship to the minimum qualifications to practice law.  There are approximately 26 subjects tested on the Texas Bar Exam.  The typical Texas attorney will never practice law in these areas, yet he is still required to test in these areas.

74.    A defendant to a Title VII disparate impact challenge may prevail only where its practices are necessary to achieve an important business goal and there are no less discriminatory alternatives. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1118-1119 (11th Cir. 1993).

75.    There are many options when it comes to ensuring the integrity of the practice of law. Based on things that have been done in the past, there are some specific alternatives to the current licensing process:

- Since it has been shown that law schools are in a better position to determine competency than the Board of Law Examiners, Texas could reinstate the diploma privilege as was once done in a majority of the states before the ABA began to influence state legislatures.

- There could be an apprentice program in lieu of the bar exam, giving attorneys actual experience in the practice of law and making them better prepared than simply giving them a written examination.  This was also done before the ABA influenced state legislatures.

- There could be oral examinations given by local judges as was done in the past.

- There could be alternative legal accreditation programs given by other organizations so as to promote competition with the Board of Bar Examiners/Bar Association, thus eliminating their monopolies.

- The Bar Exam could be re-written to test fundamental lawyering skills such as interviewing and counseling, oral advocacy and settlement negotiations instead of simply focusing on rote memorization.

- Applicants to the Texas Bar could be allowed to test in the areas of law for which they intend to practice instead of being required to be examined on every subject tested by the Board of Law Examiners.

76. Unless Defendant Travis County can show that the skills tested on the Texas Bar Exam are job related and that there are no less discriminatory alternatives, its license requirement for Attorney positions must be invalidated under Title VII.

## COUNT VII– EQUAL PROTECTION VIOLATIONS

77. The allegations in paragraphs 1 through 17 of the Complaint are all realleged and incorporated by reference. All other Counts in this Complaint are also incorporated by reference.

78. Under the Equal Protection Clause of the Fourteen Amendment, employment examinations must have a fair and substantial relationship between the purpose of the classification. The exam must distinguish between persons demonstrating minimal competence and those lacking such knowledge and skill. *Richardson v. McFadden,* 540 F. 2d 744, 748 (4th Cir. 1976).

79. The Texas Bar Exam does not give applicants an opportunity to demonstrate their knowledge and skill in the law. The Texas Bar Exam focuses on rote memorization rather than clinical capacity.

80. On the bar exam, an applicant may know the law but may still be unable to discern the area of law being tested. There are approximately twenty-two different subjects covered on the Texas Bar Exams. On the Texas Bar Exam, essay questions seldom identify the type of problem involved. As a result, a test-taker must pick the relevant law from a potpourri of possibilities. For example, an essay question on trusts may also have significant issues on tax law.

81.     The Texas Bar exam is not designed to test a candidate's application of the law; rather,
        bar exams test an individual's ability to determine which area of law is being test from a
        confusing arrangement of facts.  To make matters worse, subjects tested are regularly
        added and then dropped. The only way to know which subjects to study is to spend
        thousands of dollars on study materials such as a *Barbri* course.  Barbri does surveys on
        previous exams and is able to identify which subjects have not been tested on previous
        exams.  Bar applicants who subscribe to *Barbri* have a huge advantage.  Bar applicants
        who are indigent and can't afford to pay for *Barbri* are put at a huge disadvantage.

**COUNT VIII– FIRST AMENDMENT AND RIGHT TO PRIVACY VIOLATIONS**

82.     The allegations in paragraphs 1 through 17 of the Complaint are all realleged and
        incorporated by reference. All other Counts in this Complaint are also incorporated by
        reference.

83.     The State's licensing requirement to practice law is overbroad and infringes on Plaintiff
        Jamar Osborne's constitutional rights.

84.     States have broad power to regulate the practice of law; however, in doing so, States
        may not ignore individuals' constitutional rights. *Railroad Trainmen v. Virginia Bar*, 84
        S. Ct. 1113, 1116 (1964).  Broad regulation of the practice of law may in effect impair
        the right freedom of association.  *United Mine Workers of America v. Illinois State Bar
        Association*, 19 L. Ed. 2d 426, 431 (1967).  The First Amendment would be meaningless
        if the allowed the government to erode freedom of speech, press, petition and assembly
        so long as it does so in an indirect manner.  *Id.* at 430 (1967).  Laws which violate the
        First Amendment cannot be sustained simply because they were enacted to address valid
        concerns within the State legislature's competence. *Id.*

85.     Merely ensuring high professional standards is not a valid governmental purpose when the result is the violates a person's First Amendment rights. *NAACP v. Button*, 371 U.S. 415, 438-439 (1963).  "[R]egulatory measures . . . no matter how sophisticated cannot be employed in purpose or in effect to stifle, penalize, or curb the exercise of First Amendment Rights." *NAACP v. Button*, 371 U.S. 415, 439 (1963)." "A State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights. *Id.*

Prior Restraint

86.     The Texas bar exam requirement acts as a prior restraint on free speech.  The Texas Bar Exam tests legal opinions rather than knowledge, skill or ability.  After three years of rigorous legal training, law graduates are compelled to give their legal opinions so that the Board of Law Examiners may determine whether those opinions are valid.  The bar exam stifles free-thought and self-expression.  The message is that "you can't practice law unless you think like us."

87.      "Debate on public issues should be uninhibited, robust, and wide-open..." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  There are few issues more public than the law.

88.     The law is inherently subjective.  It cannot be proven empirically. Bar exams assume a universal interpretation of the law and compels bar applicants to accept this interpretation.  Anyone who disagrees with Board of Law Examiner's interpretation of the law is denied a license to practice law and ultimately denied the right to work.

89.     The Board of Law Examiners is intolerant of debate on the law. Bar study courses such

Barbri tells its subscribers what the law is and bar applicants are expected to regurgitate

it back on the bar exam. The individuals who administer courses such as Barbri are

typically former graders of the bar exam.  These individuals know which legal opinions

the Texas Board of Law Examiners will tolerate and which opinions it will not tolerate.

Most bar applicants wouldn't dare disagree with the Board of Law Examiner's legal

opinions out of fear for their livelihood.

90.      "If there is any fixed star in our constitutional constellation, it is that no official, high or

petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other

matters of opinion or force citizens to confess by word or act their faith therein." *Elrod*

*v. Burns*, 427 U.S. 347, 356 (1976). "Regardless of the nature of the inducement, public

employment may not be denied due to matters of opinion." *Id.*

Right to Beliefs and Privacy

91.      In a plurality decision, the U.S. Supreme Court held that the First Amendment's

protection of freedom of associations extends both to lawyers as well as bar applicants.

*Baird v. State Bar of Arizona,* 27 L. Ed. 2d 639 (1971).  The First Amendment's

protection of freedom of association prohibits States from excluding individuals from a

profession or punishing him solely because of his beliefs.  *Id.* at 646-647.  "Beliefs are

immune from bar association inquisitions designed to lay a foundation for barring an

applicant from the practice of law." *Id.* at 647.

92.    When states make broad and sweeping inquiring into these areas, citizens are discouraged from exercising their protected constitutional rights. *Baird v. State Bar of Arizona,* 27 L. Ed. 2d 639 at 647.  When a State makes inquiries into a person's beliefs and associations, it has a heavy burden to show that the inquiry is necessary to protect a legitimate state interest. *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539, 546 (1963).

93.    Under the First Amendment, the government is prohibited from telling people what they must say. *Rumsfeld v. FAIR,* 547 U.S. 47, 61 (2006).  Compelled statements of opinion are subject to First Amendment scrutiny. *Id. at 62.*  The First Amendment protects both the right to speak freely as well as the right to refrain from speaking at all. *Wooley v. Maynard* 430 U.S. 705, 714 (1977).  Both rights stem from the broader concept of individual freedom of mind. *Id.*

94.    During Justice Gingsburg's confirmation hearing for the U.S. Supreme Court, Justice Gingburg refused to discuss her legal opinions on issues of abortion, civil rights, gay rights, free speech, the death penalty etc. This has been referred to as the "Gingburg Precedent."  Since then Justice Alito has refused to give his legal opinions, as has Chief Justice Roberts.

95.    The types of issues which these Justices were called to address are similar to the issues for which bar applicants are compelled to answer on the Texas Bar Exam.  Since justices to U.S. Supreme Court are permitted to refrain from giving their legal opinions as a condition precedent to public employment, an equal application of the law would grant that same right to applicants of the state bar.   Applicants to the bar have a right to privacy and cannot be denied an occupational license based solely on their opinions.

## COUNT IX – PROFESSIONAL MALPRACTICE

96.     The allegations in paragraphs 1 through 17 of the Complaint are all realleged and incorporated by reference. All other Counts in this Complaint are also incorporated by reference.

97.     It has long been held that courts have legal authority to determine who is qualified to be one of its officers. *Ex parte Secombe,* 15 L. Ed. 565 (1856). However, the issue is not whether courts may regulate the practice of law; the issue is whether courts may exercise their regulatory power in an arbitrary or despotic manner. *Id.* The U.S. Supreme Court has held that they may not.

98.     "The practice of law is not a matter of grace, but of right for one who is qualified by his learning and his moral character." *Baird v. State Bar of Arizona,* 27 L. Ed. 2d 639, 647-648 (1971). In exercising their regulatory power, Courts have a legal duty to exercise sound and just discretion. *Ex parte Secombe,* 15 L. Ed. 565.

99.     The Texas Board of Law Examiners carries administrative functions for the Texas Supreme Court, determining who is qualified to be licensed to practice law. Both the Texas Supreme Court and the Texas Board of Law Examiners have breached their duties to exercise sound and just discretion and have used the State Bar Act as an instrument of oppression.

100.    There is absolutely no correlation between the bar exam and one's ability to practice law. The bar exam is a rite of passage. Within the legal community, the prevailing view is "we had to go through, so you must as well." This puts the Texas Bar Exam on the same level as any other form of hazing.

101.   The Texas Bar Exam was poorly designed.  The legal standard is *minimum competency*; not competitive essays questions and certainly not 200 multiple choice questions that are designed to trick the test-taker.

102.   A litany of literature demonstrates that the bar exam is a seriously flawed means of protecting consumers from incompetent lawyers. Bar exams fail to measure fundamental lawyering skills such as interviewing and counseling, oral advocacy and settlement negotiations.  Studies show that bar exams reject many people who would be excellent lawyers and often times admit those who are unfit to practice law.  Bar exams are competitive in nature, focusing on rote memorization and elimination skills rather than clinical capacity.

103.   The U.S. Supreme Court held that a law that is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Construction Co.,* 269 U.S. 385, 391 (1926).  *Connally* involved a penal statute which was invalidated because as the Court recognized, the law cannot rest on uncertain foundation.  The Court held that laws must be written so that persons of ordinary intelligence may them as well as their application. The same must be true for the bar exam.

104.   While the bar exam itself is not a law, the purpose of the bar exam is to test one knowledge of the law.  The void for vagueness standard must apply.  Transparency is the hallmark of any democratic society.  If a person doesn't understand the law after three years of rigorous legal training, how is the average layperson supposed to understand them? The Texas judiciary has a compelling interest in ensuring the efficient use of judicial resources. However, the bar exam goes too bar.  Any exam on the law

which is so vague and complicated that a person has to guess for the answer simply cannot be enforced as a matter of public policy.

105. Dr. Phillip Ackerman published a report called the "Evaluation of the Psychometric Adequacy of the California Attorney's Examination." The report found that the California bar exam was 100% subjective. This was determined based on the fact that inter-rater agreement was only 23%. In other words, the bar exam graders could not even agree on the scores given to examinees. Unfortunately, Texas uses a single grader system; therefore, there is no way to determine whether the Texas Bar Exam is objective or subjective. The Texas Board of Bar Examiners has essentially immunized itself from public accountability.

106. The Texas Board of Law Examiners assumes that the Texas Bar Exam is not subjective because its reliability is comparable other state bar exams. This is not a valid argument. It may very be that all state bar exams are subjective. Assuming arguendo that the Texas Bar Exam's reliability is comparable to other states, that still doesn't mean that it is reliable when compared to standardized tests in general. In order for the Texas Bar Exam to meet the testing industry's standards of reliability, the Texas Bar Exam must satisfy both content validity as well as criterion validity. The Texas Bar Exam does neither.

107.    Plaintiff Jamar Osborne contacted the Texas Board of Law Examiners several times requesting empirical data proving the Texas Bar Exam's content and criterion validity. Specifically, Mr. Osborne asked the following questions:

- How was it determined that 675 is the magic number for whether a test-taker is competent or incompetent?

- To what degree of certainty can it be said that a test-tester who scored below 675 is in-fact incompetent to practice law?

- How was it determined that the subjects tested on Texas Bar Exam are necessary for practicing law in the state of Texas?

  - Why doesn't the exam focus on critical skills such as interviewing and counseling, oral advocacy and settlement negotiations?

108.    The Board did not respond to Mr. Osborne's request. Instead The Board sent a demographical study showing racial disparities between Caucasian applicants and African-American applicant.  Mr. Osborne then contacted Texas Senator John Carona, requesting the same information.  The Board's response was still unresponsive, claiming "[n]o test is perfect."

**COUNT X– SUBSTANTIVE DUE PROCESS VIOLATIONS**

**AND PUBLIC NUSIANCE**

109.    The allegations in paragraphs 1 through 17 of the Complaint are all realleged and incorporated by reference. All other Counts in this Complaint are also incorporated by reference.

110.  The State's licensing requirement, bar exam requirement and bar membership requirement constitute a deprivation of substantive due process and a public nuisance.

111.  Texas Penal Code § 38.122 § and 38.123 make it a criminal offense for any person who is not a member of the State Bar to serve as counsel in any legal proceeding.  However, "[t]he claim and exercise of a constitutional right cannot be converted into a crime." *Miller vs. U.S.,* 230 F. 2d 486, 489 (5th Cir. 1956).

112.  Under the U.S. Constitution, each citizen is guaranteed the right to counsel. Including in the right to counsel is the right to counsel of choice.  The right to counsel of choice is a fundamental right. This isn't a privilege such as driver's license. Every citizen is entitled to the counsel of his or her own choosing.

113.  Since citizens have a constitutional right to receive assistance of a counsel from unlicensed attorneys, it goes without saying that unlicensed attorneys a right to provide said services and receive just compensation.  The two issues are inseparable.   To say otherwise would be analogous to legalizing marijuana while criminalizing its sale or possession. *Implicat aliorum consectetur inclusione.*  "The inclusion of one implies the inclusion of others."

114.    The practice of law is a natural right shared by all members in democratic society; it is not a privilege granted by the State.  From a natural rights perspective, individuals have inalienable rights to life, liberty and property.  Two consenting individuals should be free to enter into any into any mutually acceptable trade agreement they deem appropriate and keep any property realized from such an exchange. Natural rights are endowed by our creator, not the State.  As Thomas Paine explained in *Rights of Man,* rights cannot be granted by law because the implication would be that they can be revoked and reduced to privileges.  The right to practice law is also protected under the First Amendment's right to petition the government for redress of grievances.

Right to Petition the Courts

115.    "In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate... political activity, a purpose which would have no basis whatever in the legislative history of that Act." *California Motor Transport v. Trucking Unlimited,* 404 U.S. 508, 510 (1972).

116.    "The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Id.* at 510.  The right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right of petition. *Id.*

117.    The Court in *California Motor Transport* held that it would violate the rights of association and petition to deny groups of common interest the right to use state and federal courts as a channel to advocate their causes. *Id. at* 510-511.  "[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Restaurants, Inc., NLRB*, 461 U.S. 731, 741 (1983).

118.     "[L]itigation may well be the sole practicable avenue open to a minority to petition for redress of grievances." *Id.* at 429.   For political groups with unconventional ideas, "association for litigation may be the most effective form of political association." *Id. at* 431. "[L]itigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local… in this country. It is thus a form of political expression. Groups which find themselves unable to achieve their objectives through the ballot frequently turn to the courts." *NAACP v. Button,* 371 U.S. 415, 429 (1963).

119.    The right to petition the Government for a redress of grievances is implied by "the very idea of government, republican in form." *BE & K Construction Co., v. NLRB*, 536 U.S. 516, 524-525(2002).

120. "Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them." *Miranda vs. Arizona,* 384 U.S. 436, 491 (1966). The State has no authority to regulate the practice of law to the extent that it deprives individuals of their constitutional right to counsel of choice or the right to petition the courts.   Legitimate legislative goals "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker,* 364 U.S. 479, 488 (1960).

121. The state has a public policy interest in preserving judicial resources.  However, the bar exam goes too far.  Neither the State's licensing requirement, nor Texas Bar Exam are narrowly tailored because there are less restrictive alternatives available.

Doctrine of Standing

122. According to Texas law, only members of the bar are permitted to petition the courts to redress grievances on behalf of others.  Texas law permits individuals to represent themselves in legal proceedings, but only where the individuals suffer a direct injury.

123. The doctrine of standing is a doctrine concocted by attorneys to deprive citizens of their First Amendment right petition the government for redress of grievances.  Courts claim that the doctrine of standing stems from the *Case or Controversy* requirement. However, it is possible for a plaintiff to demonstrate a case or controversy without proving a direct injury.  In fact, plaintiffs did so for many years before the doctrine was created.  Prior to the inception of this doctrine, citizens enjoyed the right to pursue private prosecution of public rights.

124.    In order for the doctrine of standing to be plausible, it would have to be applied to all aspects of government in which citizens seek redress of grievances and not just the courts. Citizens would be barred from reporting the child abuse of their neighbor's children because they lack standing. Citizens would only be permitted to lobby their legislative representatives where they suffer a direct injury.

125.    The premise behind the doctrine of standing is that we are not our brother's keeper. Courts are requiring citizens to turn blind eye to our neighbor's suffering and do nothing. It is this type of isolationist thinking that allowed The Holocaust to happen. As a matter of public policy, the doctrine is standing unconscionable.

126.    Dr. King once said that "an injustice to one is an injustice to all." An injury against my neighbor is a direct injury against me. We do not live in a vacuum. Citizens have a constitutional right to petition the courts for redress of grievances irrespective of whether or not they meet standing requirements.

Lack of Quorum

127.    As matter of Texas Constitutional law, the State Bar Act is invalid because there was no legal quorum. The State Bar Act was passed in Texas in 1939. At that time, 49 percent of the House of Representatives and 87 percent of the Texas Senate were practicing attorneys. Every attorney who voted on the State Bar Act had a direct and personal pecuniary interest in the bill. Therefore, they were required to disclose their conflict of interest to the legislature and recuse themselves.

## COUNT XI– BILL OF ATTAINER VIOLATION

130.   The allegations in paragraphs 1 through 17 of the Complaint are all realleged and incorporated by reference. All other Counts in this Complaint are also incorporated by reference.

131.   The State Bar Act has punitive effects. Failing the bar exam can have catastrophic consequences for law graduates. Those who fail the bar exam may be unable to find employment or may lose their jobs if they are already employed in the legal field. Employers may to be reluctant to hire bar-failers even for non-traditional legal jobs that don't require the practice of law.

132.   Research shows that law graduates who are not "licensed" end up worse off financially than those who only have undergraduate degrees despite the fact that law graduates tend to have higher undergraduate grades than average college graduates.  In fact, having a law degree without a license places these individuals at an even greater disadvantage because many employers will not hire law graduates for non-legal positions.  As a result, law graduates may be unable to repay their student loan debt.

133.   Since the Texas Bar Exam is only offered twice a year, an applicant who fails will have to wait for an additional six months to take the bar exam again.  During that six month period, finding employment may difficult so bar applicants end living student loans or credit card debt just to provide for their basic needs.  When the time comes to take the exam again, most applicants will spend thousands of dollars on study materials and may even hire a private tutor in order to pass.

Texas Constitution Article 2, Section 22 states:

> Sec. 22.  DISCLOSURE OF PRIVATE INTEREST IN MEASURE OR BILL; NOT TO VOTE.  A member who has a personal or private interest in any measure or bill, proposed, or pending before the Legislature, **shall disclose the fact to the House**, **of which he is a member**, **and shall not vote thereon**.

128.    As officers of the courts, attorneys are *de facto* members of the judiciary.  Article 2, Section 1 of the Texas Constitution requires separation of powers within the Texas government. Members of the Texas Legislature may serve contemporaneously as members of the Texas Judiciary.

> Tex. Const. Art. 2, 1:
>
> DIVISION OF POWERS; THREE SEPARATE DEPARTMENTS; EXERCISE OF POWER PROPERLY ATTACHED TO OTHER DEPARTMENTS. The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

129.    By enforcing the State Bar Act, the State of Texas has deprived Plaintiffs Jamar Osborne and Mikal Osborne of substantive due process in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution.

134.   If the applicant doesn't pass on his or her third attempt, the taking bar exam may become too much of a financial burden.   Individuals who do not have the financial resources to pay for study aids may be permanently excluded from the practice of law. At this point, getting a non-legal job may be insufficient given the amount of debt that the applicant has at this point.   Some applicants may even go bankrupt.   The State Bar Act causes extreme financial hardship and destroys people's lives.

135.   The U.S. Supreme Court held that where a legislative decree results in perpetual exclusion from the practice of law, the result is a punishment, subject to the constitutional prohibition against bills of attainer.   *Ex parte Garland*, 18 L. Ed. 366, 379 (1866).   The State Bar Act is clearly a bill of attainer. It singles out a class of people (law graduates) and punishes them without due process.

## COUNT XII– INVERSE CONDEMNATION

136.   The allegations in paragraphs 1 through 17 of the Complaint are all realleged and incorporated by reference. All other Counts in this Complaint are also incorporated by reference.

137.   This Inverse Condemnation claim against the Defendant Board of Law Examiners is for property which has been taken by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.

138.   Plaintiff Jamar Osborne submitted registration fees to the Board of Law Examiners along with his application for admission to the Texas Bar. The purpose of these fees was to pay for Plaintiff to take the Texas Bar Exam.   Mr. Osborne later notified the Board of Law Examiners that he would not able to take the bar exam due to work conflict.

139. The Board of Law Examiners refused to issue a refund or credit the fees toward a future application.

140. Rule XVIII(b) of the *Rules Governing Admission to the Bar of Texas* states that "[n]o refund or transfer of fees will be made in the event of the withdrawal of any Declaration or Application…" This rule provides notice but provides no opportunity to be heard. This rule makes no exception and makes no distinction between reasons that are valid and reasons that are invalid.

141. The Board's enforcement of this rule has deprived Mr. Osborne of any due process to determine whether or not his reason for not being able to take the Texas Bar Exam was valid. The Board of Law Examiners converted Mr. Osborne's registration fees from a private use to a public use. Mr. Osborne never consented to having his money be used for this purpose.

142. The Board of Law Examiners' conduct constitutes a taking of personal property without due process and without compensation in violation the Fifth and Fourteenth Amendments of the United State Constitution and Article I, § 17(a) of the Texas Constitution.

## COUNT XIII– PROFESSIONAL MALPRACTICE

143. The allegations in paragraphs 1 through 17 of the Complaint are all realleged and incorporated by reference. All other Counts in this Complaint are also incorporated by reference.

144. Defendant Julia E. Vaughan has committed professional malpractice by breaching her duty to ensure that the Texas Bar Exam meets the testing industry's standard of reliability and validity.

## ISSUES

145.   Whether the State violates citizens' constitutional right to counsel of choice by criminalizing the practice of law by an unlicensed attorney.

146.   Whether the founding fathers of the U.S. Constitution intended for the word "counsel" as it applies to the Sixth Amendment and Due Process to mean to "members of the bar."

147.   Whether the State's licensing requirement to practice law is narrowly tailored to achieve a compelling state interest.

148.   Whether State's bar exam is narrowly tailored to achieve a compelling state interest.

149.   Whether Texas' prohibition against the practice of law by nonmembers of the bar constitutes a monopoly as defined by Federal Law and the Texas Constitution.

150.   Whether the state of Texas has constitutional authority to grant the State Bar a complete monopoly, compelling individuals to be represented by members of the bar, against their will and at their own expense when free competent counsel is available by someone who is not a member of the bar.

151.   Whether the State's requirement that individuals have a license in order to practice law deprives individuals of their constitutional right to petition the government.  Whether the doctrine of standing does the same.

152.   Whether the Texas Bar Exam tests matters of empirical fact or matters or legal opinions. May the State deny an occupational license based on an individual's opinions?

153.   Whether the State violates an individual's First Amendment rights and right to privacy by compelling him to give detailed legal opinions as a condition for a license to practice law.

154.   Whether the Texas Bar Exam bears a fair and substantial relationship to the determination of minimal competency to practice law.

155.   Whether the Texas Bar Association is a labor union.  If so, may the State of Texas or its political subdivisions may deny an individual employment based on membership or non-membership in such a labor union?

156.   Whether it violates a citizen's constitutional right to freedom of association for the State to compel individuals to associate with the State Bar as a condition precedent for the right to practice law.

157.   Whether the State of Texas has violates individuals' right to substantive due by enforcing the State Bar Act given that the Act is invalid for failure to satisfy quorum requirements.

158.   What level of competency is the State legally authorized to require: minimum, general competitive or expert.

159.   Is the State Bar even accountable to state and federal constitutions or do they get to just make it up as they go along?

## **INJURY TO PLAINTIFFS**

Plaintiff Mikal Osborne

160.   Plaintiff Mikal Osborne was denied his counsel of choice by the State of Texas.  In doing so, the State has deprived Plaintiff of his constitutional rights to due process and freedom of association.

161.    Since Mikal Osborne is not trained in the law, he had no choice but to hired a member of the bar, whom he never knew, nor trusted.   But for the State's regulation, Mikal Osborne would have received free legal services from his brother Jamar Osborne. Instead, he was compelled to be represented by a total stranger.  As a result, Mikal Osborne was price-gouged by his attorney in the amount of $10,288.08.

Plaintiff Jamar Osborne

162.    The State's licensing requirement, bar exam requirement and requirement to be a member of the State Bar in order to practice law violates Plaintiff Jamar Osborne's right to freedom of speech, right to petition the government, right to freedom of association and freedom of expression. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Elrod v. Burns* 427 U.S. 347, 373 (1976).  The State's Bar Exam requirement also violates Plaintiff Jamar Osborne's right to privacy.

163.    Plaintiff Jamar Osborne first ran into financial problems when he failed the bar exam on his first attempt. He wanted to work but believed that it would be best to put all of his energy into passing the bar exam. During that period, Mr. Osborne used his credit to pay for his basic living expenses . He thought that he would eventually be able to repay them after he passed the bar exam. However, he never did.  Mr. Osborne's student loans went into default, as did his credit cards.  He ended up having to file for bankruptcy at the age of 28.  His credit has been ruined.  Plaintiff is now ineligible to buy a home and even has difficulty getting approval on apartment leases.

164.   Plaintiff Jamar Osborne has had many doors closed due to my law degree.  As someone
who has a law degree and isn't licensed, feels that employers treat him worse than a
convicted felon.  During job interviews, Mr. Osborne was often asked, "Why would
someone with a law degree want to work here?"  Employers assume that law graduates
are looking for temporary employment and will ultimately leave to work for prestigious
law firms. Mr. Osborne thought having a law degree would increase his career prospects
but the opposite proved to be true.

165.   During job interviews many employers made inquiries into whether or not Mr. Osborne
has passed the bar exam upon seeing his law degree on his resume or job application.
Once they learn that Mr. Osborne has not passed the bar exam, he is often regarded as
incompetent and denied employment on that basis (and these were jobs that had nothing
to do with practicing law).

166.   As a result of this career purgatory (which can last for years), unlicensed attorneys face
substantial financial hardships.  Even with a law degree, Mr. Osborne ended up working
at a 7-Eleven gas station earning minimum wage.  And he only got that job because he
did not tell them about his educational background.  It was the most humiliating
experience of his life.  He could barely afford to pay for basic living expenses, let alone
his debt.  He ended up filing for bankruptcy.

167.   Since Mr. Osborne knew could not get a job based on his law degree, he decided to go
back to school for a Master's Degree which he completed last year.  Now he has even
more student loan debt and he's not sure when or if I will ever earn enough money to
repay them.

168.    Mr. Osborne has done everything from volunteering for the courts, working at a Seven-Eleven gas station for minimum wage, delivering phone books etc. Mr. Osborne is currently relegated to taking unapproved drugs in clinical trials to pay his basic living expenses. Mr. Osborne has not even begun to pay his student loans.

169.    The State's licensing requirement has effectively ruined his reputation among his colleagues. Upon discovering that Mr. Osborne failed the bar exam, one of his friends said, "Jamar, I thought that you were smart." Mr. Osborne stopped communicating with many of his friends from law school due to his embarrassment. Failing the bar exam has also affected his social relations. Mr. Osborne could not handle constantly being asked, "Where do you work?" Mr. Osborne has had many arguments and lost many friends over this issue. Mr. Osborne experienced severe depression. As a result, Mr. Osborne became a recluse in order to avoid personal questions about his employment status.

170.    Mr. Osborne's friends and family are aware of the fact that he has a law degree. They often seek his legal advice on matters of private concern. These individuals seek Mr. Osborne's counsel rather than the counsel of a licensed attorney because none of them can financially afford the hourly rates of the average attorney. Additionally, given the intimate nature of these relationships, these individuals trust Mr. Osborne's advice more than they would trust the opinion of a random stranger (attorney) selected out of a phonebook. Even though Mr. Osborne is competent to give these individuals legal advice, he is compelled by state law to refuse doing so. Mr. Osborne's inability to help friends in need of assistance has strained many of his interpersonal relationships.

171.   Failing the bar exam has put a strain on his relationships with both of Mr. Osborne parents.  Mr. Osborne was embarrassed and felt pressured by his parents to become a licensed attorney.  Plaintiff could not handle the stress.  Plaintiff hasn't talked to his father in several years and only recently began talking to his mother against after not speaking to her for a few years.

172.   Mr. Osborne grew up wanting to become a civil rights attorney.  Mr. Osborne went to law school to promote social change.  Mr. Osborne is activist and is member of several local activist organizations.  The fact that Mr. Osborne is not licensed to practice law has frustrated his ability to be an effective activist. Mr. Osborne has three years of rigorous legal training that he cannot put to use.  The Texas Bar Act has eliminated Mr. Osborne's ability to petition the courts on behalf of many individuals who have sought his counsel.

173.   In January 2013, Mr. Osborne was denied employment with Travis County due to the fact that he was not licensed to practice law in the State of Texas.  The State's license requirement will continue to cause ongoing and irreparable him to his reputation, his credit, and employment opportunities.

174.   Mr. Osborne has already spent thousands of dollars attempts to become licensed to practice law.  Mr. Osborne has registered to take Texas Bar exam four times.  The study materials cost thousands of dollars, not to mention the registration fees and travel costs.

175.   Mr. Osborne has since learned of Bar Associations' history or racism, elitism and

conduct which he believes is illegal and immoral.  Mr. Osborne no longer wishes to

associate with such an organization.  Mr. Osborne further objects to being required to

spending thousands of dollars in registration fees, study materials etc.  towards the

testing and licensing industry, industries which he finds reprehensible.

## EXHAUSTION OF REMEDIES

176.   Plaintiff Jamar Osborne contacted Texas Representative Rafael Anchia on September

22, 2012 explaining the hardships he has faced with the State's licensing requirement to

practice law.  Mr. Osborne requested a constitutional amendment repealing the Texas

Bar Act and the Texas Supreme Court's regulation of the legal profession.  Mr. Anchia's

Legislative Director, Tricia Horatio informed Mr. Osborne that the State Bar Act was

necessary to "ensure the integrity of the practice of law in the state."  Both Mr. Anchia

and Ms. Horatio are licensed members of the Texas Bar, which is a clear conflict of

interest.

177.   Plaintiff Jamar Osborne contacted Federal Congresswoman Eddie Bernice Johnson

several times expressing his concerns with constitutional violations of the State's bar

requirement.  Congresswoman Johnson claimed that the regulation of the practice of law

is a state issue and that the federal government has no jurisdiction.  Congresswoman

Johnson claimed lack of jurisdiction, despite the fact that the federal government does in

fact have jurisdiction to regulate state activity where it has an adverse impact on

interstate commerce.

178.   Plaintiff Jamar Osborne contacted the U.S. Equal Employment Opportunity Commission Washington Field Office on December 23, 2012.  The Commission claimed lack of jurisdiction.

179.   Plaintiff Jamar Osborne contacted Texas Attorney General Greg Abbott.  His office claimed that my concerns were federal issues and that I should contact my U.S Senator.

180.   Plaintiff Jamar Osborne contacted U.S. Senator John Cornyn several times.  Senator Cornyn has claimed that the regulation of the practice of law is a state issue and that the federal government has no jurisdiction.

181.   Plaintiff Jamar Osborne contacted the U.S. Department of Justice Antitrust Division on December 23, 2012.  The Department claimed that the regulation of the practice of law is a state issue and that the federal government has no jurisdiction.

182.   Plaintiff Jamar Osborne contacted Texas Senator John Carona several times.  Senator Carona expressed sympathy with Mr. Osborne's situation. However, Senator Carona felt that proposing any changes to the State's licensing requirement would "encounter a significant amount of opposition" and that there would be "no support in the legislature."  There is no doubt that the reason Senator Carona felt this way is because the Texas Legislature is monopolized by attorneys (both in the House and the Senate).

183.  Plaintiff Jamar Osborne filed a formal complaint the U.S. Equal Employment
      Opportunity Commission Dallas District Office on March 22, 2013. Usually, The
      Commission requires the parties to mediate prior to giving the plaintiff a Notice of Right
      to Sue. However, the Commission felt that it would be a waste of time to bother with
      their mediation process. The Commission gave Mr. Osborne a Dismissal and Notice of
      Right to Sue without even investigating his claim. The Commission even advised Mr.
      Osborne not to file a lawsuit and suggested he should instead focus his energy on
      passing the bar exam.

184.  Mr. Osborne's last resort was to seek relief in the courts. Mr. Osborne wished to file the
      instant case as a class action lawsuit. However, Mr. Osborne cannot afford the egregious
      legal fees charged by members of the Texas Bar. Furthermore, Mr. Osborne has no
      confidence that a member of the Bar would adequately represent his interest given their
      own personal conflicts. Mr. Osborne also contends that representation by a member of
      the bar would have prejudiced that the jury and deprived him of a fair and impartial trial.
      Mr. Osborne had no choice but to forego his class action lawsuit so that he may
      represent his claim *pro se*. Mr. Osborne's counsel of choice would have been someone
      who is knowledged in the law but not a member of the bar. At the current time, this
      would be a legal impossibility. Once again, Plaintiff has been deprived of due process.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.  A declaratory judgment that the State Bar Act is unconstitutional and illegal;

B.  Grant a permanent injunction enjoining Defendants from enforcing the State Bar Act as described in the Texas Government Code Sec. 81.102;

C.  A declaratory judgment that the State's Bar Exam requirement is unconstitutional and illegal as currently enforced.

D.  A declaratory judgment that the State Bar's monopoly over the practice of is unconstitutional and illegal.

E.  Order the Defendants to make the State licensing and bar exam requirement narrowly tailored.  Order the Defendants to implement less restrictive alternatives;

F.  A declaratory judgment that Defendant Travis County's employment practices are racially discriminatory and in violation of Title VII of the Civil Rights Act.

G.  An injunction ordering the Defendants State of Texas and Travis County to institute and carry out policies, practices and programs which provide equal employment opportunities and eradicate the effects of its past and present unlawful practices;

H.  Grant a permanent injunction enjoining the Defendants, their officers, successor, assigns, and all person in active concert or participating with them, from engaging in any employment, licensing or testing practices which have a disparate impact on the basis of race;

I.  A declaratory judgment that Rule XVIII(b) of the *Rules Governing Admission to the Bar of Texas is unconstitutional;*

J.  An order that The Texas Supreme Court and Texas Board of Law Examiners are liable for taking Plaintiff Jamar Osborne's bar exam fees and converting them to a public purpose.

K.  A judgment that Defendant State of Texas is liable for compensatory damages for the State's regulatory takings, past and future pecuniary losses resulting from the State's unlawful licensing practices, including humiliation, embarrassment, loss of employment opportunities, inconvenience and loss of enjoyment of life;

L.  A declaratory judgment that Defendant Julia E. Vaughan has committed professional malpractice and an order holding her personally liable for all damages resulting from her negligence.

M.  A declaratory judgment that Defendant Buck Files has committed professional malpractice and an order holding him personally liable for all damages resulting from his negligence.

N.  Nominal damages for deprivation of Plaintiffs constitutional rights;

O.  An award of attorneys' fees, costs, and expenses in this action; and

P.  Other and further relief as this Court may find is just and proper.


## JURY TRIAL DEMAND

Plaintiffs requests a jury on all issues of raised by its complaint.

Respectfully submitted,

JAMAR OSBORNE, J.D., M.P.A
PLAINTIFF PRO SE
Executive Director
Citizens Against The Bar
P.O. Box 195226
Dallas, TX 75219
(817) 400-0091

MIKAL OSBORNE
PLAINTIFF PRO SE
Director
Citizens Against The Bar
P.O. Box 195226
Dallas, TX 75219
(817) 400-0091